**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

——————————————— x

HUNTER WYLIE, Derivatively on   : Civil Action No. 3:08-cv-1036-
Behalf of W HOLDING COMPANY,   : GAG
INC.,   :
  :
            Plaintiff,   :
  :
  vs.   : PLAINTIFF'S OPPOSITION TO THE
  : DEFENDANT'S MOTION TO DISMISS
FRANK C. STIPES, PEDRO R.   : VERIFIED AMENDED SHAREHOLDER
DOMINGUEZ , FREDDY PEREZ   : DERIVATIVE COMPLAINT
MALDONADO, NORBERTO RIVERA, RAMON :
ROSADO, CESAR A. RUIZ, CORNELIUS :
TAMBOER, HECTOR L. DEL RIO, JUAN :
C. FRONTERA, JOSE M. BIAGGI and   :
RICARDO HERNANDEZ,   :
  :
           Defendants,   :
  :
  -and-   :
  :
W HOLDING COMPANY, INC., a Puerto :
Rico corporation,   :
  :
         Nominal Defendant.:

——————————————— x

## TABLE OF CONTENTS

                                                                  Page

TABLE OF AUTHORITIES.........................................iii

I.    INTRODUCTION............................................1

II.   FACTUAL HISTORY.........................................4

      A.    W Holding's Moves Traditional Lending to Risky
            Asset Based Lending...............................4

      B.    Inyx's Business Credit Division Loans.............5

      C.    The Senior Credit Committee Wrongly Approves and
            the Board Wrongly Ratifies Inyx Loans Amounting
            to $142 Million...................................6

III.  LEGAL STANDARDS FOR THE COURT'S DEMAND FUTILITY
      ANALYSIS................................................7

IV.   THE COMPLAINT'S PARTICULARIZED ALLEGATIONS OF FACT
      ESTABLISH THAT DEMAND IS FUTILE........................10

      A.    Demand Is Futile Against the Senior Credit
            Committee Members for Failing to Exercise Valid
            Business Judgment in Approving Inyx Loans........10

            1.    The Senior Credit Committee Knew or Were
                  Reckless in Not Knowing of Inyx's Financial
                  Problems...................................11

            2.    The Senior Credit Committee Did Not Exercise
                  Valid Business Judgment in Approving
                  Additional Loans to Inyx...................13

            3.    If They Did Not Approve the Inyx Loans, the
                  Senior Credit Committee Faces Substantial
                  Liability for Failing to Act in the Face of
                  a Known Duty...............................15

      B.    Demand Is Futile as to the Entire Board for
            Making False Statements Concerning the Board's
            Oversight of the Inyx Loans......................17

V.    PLAINTIFF HAS STATED A CLAIM FOR EACH CAUSE OF ACTION.....18

      A.    Plaintiff Has Stated a Claim Under Section 304 of
            the Sarbanes-Oxley Act of 2002...................19

      B.    Defendants Wasted Corporate Assets by Approving
            Loans to Inyx Which They Knew or Should Have
            Known Were Impaired..............................20

C.   Plaintiff Has Adequately Pled a Claim for Unjust
     Enrichment..........................................21

D.   Plaintiff Has Adequately Pled a Claim for
     Violation of Title 14, Section 2727.................22

E.   Plaintiff's Claims Against the Directors Are Not
     Barred by W Holding's Charter.......................23

VI.   PLAINTIFF HAS STANDING TO BRING THIS ACTION..............24

VII.  CONCLUSION..............................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alidina v. Internet.com Corp.*,
No 17235-NC, 2002 WL 31584292
(Del. Ch. Nov. 6, 2002)................................... 23

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984)............................ *passim*

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000)............................. 8, 20

*Cal. Pub. Employees' Ret. Sys. v. Coulter*,
No. 19191, 2002 WL 31888343
(Del. Ch. Dec. 18, 2002)......................... 9, 13, 14

*Conley v. Gibson*,
355 U.S. 41 (1957)...................................... 19

*Cort v. Ash*,
422 U.S. 66 (1975)...................................... 19

*Grimes v. Donald*,
673 A.2d 1207 (Del. 1996)................................. 8

*In re Abbott Labs. Derivative S'holders Litig.*,
325 F.3d 795 (7th Cir. 2003)............................ 17

*In re Biopure Corp. Derivative Litig.*,
424 F. Supp. 2d 305 (D. Mass. 2006)..................... 15

*In re Cendant Corp. Derivative Action Litig.*,
189 F.R.D. 117 (D.N.J. 1999)...................... 8, 9, 15

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)............... 10, 17

*In re First Bancorp, Derivative Litig.*
465 F. Supp. 2d 112 (D.P.R. 2006)........................ 7

*In re New Valley Corp.*,
No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001)....... 15

*In re NVF Co. Litig.*,
No. 9050, 1989 WL 146237 (Del. Ch. Nov. 22, 1989)....... 10

*In re Tower Air, Inc.*,
416 F.3d 229 (Del. 2005)................................ 23

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006)................................... 15

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
  741 A.2d 377 (Del. Ch. 1999).................... 11, 15, 21

*Judge v. City of Lowell*,
  160 F.3d 67 (1st Cir. 1998)............................ 19

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)....................................... 7

*Langadinos v. Am. Airlines, Inc.*,
  199 F.3d 68 (1st Cir. 2000)........................ 19, 25

*Malone v. Brincat*, 7
  22 A.2d 5 (Del. 1998)............................... 11, 17

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001)............................ 9

*Michelson v. Duncan*,
  407 A.2d 211 (Del. 1979)............................... 20

*Nollet v. Justices of the Trial Court of Mass.*,
  83 F. Supp. 2d 204 (D. Mass. 2000),
  *aff'd*, 248 F.3d 1127 (1st Cir. 2000).................... 19

*Plymouth County Ret. Ass'n v. Schroeder*,
  No. 07-04772 (ADS) (ETB), 2008 WL 4254151
  (E.D.N.Y. Sept. 5, 2008)............................... 24

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993)............................. 8, 10

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007)........................ 10, 17

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del. 2006)............................... 15

*Surowitz v. Hilton Hotels Corp.*,
  383 U.S. 363 (1966).................................... 25

*Wadsworth, Inc. v. Schwarz-Nin*,
  951 F. Supp. 314 (D.P.R. 1996)......................... 22

**STATUTES**

Delaware
  Section 102(b)(7)...................................... 23

Federal Rule of Civil Procedure

    12(b)(6).............................................. 18, 19
    15(a)................................................. 25
    23.1................................................. 24
    23.1(a).............................................. 24

## I.    INTRODUCTION

In search of higher profits, the W Holding Company, Inc. ("W Holding" or the "Company") Board of Directors (the "Board")[1] approved, reviewed and ratified the issuance of a large number of risky asset-based loans through the business credit division subsidiary of the Company.[2]  To presumably control the Company's high risk exposure from these precarious loans, a Senior Credit Committee consisting of five Board members, including W Holding Chief Executive Officer ("CEO") Stipes, a Westernbank First Vice President, Dominguez, defendants Del Rio, Frontera and Tamboer, and six members of management, was tasked with reviewing and ratifying all Business Credit Division loans in excess of $500,000, and expressly approving all Business Credit Division loans in excess of $15 million.  ¶¶7, 47, 79.[3]  As an additional safeguard, the entire Board was tasked with reviewing and approving all loans over $15 million and expressly approving loans over $50 million.  ¶¶47, 79.

In connection with this growth strategy, the Senior Credit

---

[1] At the time of filing the original complaint, the Board consisted of defendants Frank C. Stipes ("Stipes"), Pedro R. Dominguez ("Dominguez"), Freddy Perez Maldonado ("Maldonado") Cornelius Tamboer ("Tamboer"), Hector L. Del Rio ("Del Rio"), Juan C. Frontera ("Frontera") and Cesar A. Ruiz ("Ruiz")(collectively the "Director Defendants").

[2]  W Holding operates as the holding company for its wholly-owned subsidiary Westernbank, Puerto Rico ("Westernbank").  Westernbank operates five divisions, including the Westernbank Business Credit Division, which conducts commercial asset-based lending activities.

[3] All paragraph references ("¶__" and "¶¶__") are to Plaintiff's Verified Amended Shareholder Derivative Complaint for Violations of the Sarbanes Oxley Act of 2002, Breach of Fiduciary Duty, Waste of Corporate Assets, Violations of Puerto Rico General Corporations Law of 1995, Chapter 204 §2727 and Unjust Enrichment, filed on June 10, 2008 (the "Complaint").

Committee approved and the entire Board reviewed and ratified a $46 million loan to Inyx, Inc. ("Inyx") in 2005.  ¶42.  Inyx became a substantial borrower and made up twenty-three percent of the outstanding Business Credit Division loans by 2006.  ¶¶41, 42, 81. Throughout 2006, however, warning signs emerged that inventory and receivables put up for collateral were insufficient and that Inyx would not be able to pay back any of the loans.  ¶¶43, 78.  These red flags included Inyx's failure to disclose information to auditors, Company calls concerning an "alarming" number of accounts receivable that had shifted to "ineligible" or "critical", Inyx representatives making absurd claims as to sources of future repayments and actual notification by Inyx that it was going to write off $37.6 million of accounts receivable.  *Id.*

Despite this substantial evidence that the collateral for previous loans was wholly insufficient, the Senior Credit Committee continued to approve loans to Inyx.  *Id.*  Even worse, during this period, the Board made statements designed to reassure the public about the safety of asset based loans, declaring that "[c]ommercial ... loans, exceeding $500,000, are individually evaluated for impairment" and that the Company's asset quality continued to be strong "in spite of the Company's continued loans portfolio growth."  ¶¶53-62.  Then, after two years of blindly giving Inyx money, defendants disclosed that there was a $105 million collateral deficiency on the $142 million of Inyx loans secured by their accounts receivable and commercial property - $105 million which the Company is unlikely to ever recover.[4]  ¶¶5, 47, 79.

---

[4]  Due to their failed loans, the Company has been forced to expend resources in pursuing a suit against Inyx which alleges that

Despite the known facts, Defendants[5] now argue that they were the actual parties defrauded by Inyx. *See* The W Holding Defendants' Memorandum in Support of Motion to Dismiss Verified Amended Shareholder Derivative Complaint ("Mot.") at 2. As plaintiff details, however, Defendants set the Company up for this "fraud" by approving excessive loans to Inyx and ignoring red flags, in conscious disregard of their duties as members of the Senior Credit Committee and/or Board, when the collateral offered for these loans was insufficient and illusory. Although Defendants contend that plaintiff has alleged no facts demonstrating that the Director Defendants knew that $120 million of outstanding Inyx loans were severely impaired, they are wrong. Plaintiff's Complaint contains detailed factual allegations demonstrating a fraud so obvious that the Director Defendants must have been aware of it or were reckless in not knowing. Despite this knowledge, the Director Defendants continued throwing good money after bad.

As plaintiff has pled in detail, the Director Defendants' actions in approving excessive loans to Inyx was not a valid exercise of business judgment, thus they breached their fiduciary duties to the Company. These facts - all of which must be accepted as true at this point — demonstrate that making a demand upon those who approved the Inyx loans was futile.

In addition to arguing that a demand was required, Defendants also seek to dismiss this action on the grounds that plaintiff has

representatives of Inyx submitted false and/or fraudulent invoices to induce the Company to loan them funds. ¶43 n.3.

[5] "Defendants" include the Director Defendants and Norberto Rivera, Ramon Rosado, Jose M. Biaggi and Ricardo Hernandez, four officers of W Holding.

purportedly failed to state a claim for violations of Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX") and his state common law claims.  Mot. at 21-24.  Notably, however, Defendants fail to challenge plaintiff's breach of fiduciary duty claims.  Based on the facts alleged in the Complaint and for the reasons detailed below, plaintiff has adequately pled all of his claims.

For the foregoing reasons and as detailed more fully herein, Defendants' motion to dismiss should be denied in its entirety.

## II.  FACTUAL HISTORY

### A.  W Holding's Moves Traditional Lending to Risky Asset Based Lending

Over the past several years, W Holding (through Westernbank) has pursued an aggressive growth strategy by expanding its products and services.  ¶¶40-41.  In June, 2001, Westernbank entered the perilous asset-based lending business with its acquisition of what became the Business Credit Division.  ¶40.  Commercial asset-based lending is a riskier undertaking than traditional asset-based lending because it often involves loans based on less stable assets such as inventory and accounts receivable, with the expectation that the bank would charge higher fees and interest rates.  *Id*.

As a speculative segment, the Business Credit Division experienced higher yields than other divisions of Westernbank.  ¶41.  Thus, it became the target of an aggressive growth strategy.  *Id*.  In December 2002, the Business Credit Division's outstanding loans were approximately $427.7 million.  *Id*.  This number rapidly increased over the next four years, and by December 2006, the Business Credit Division's loan portfolio had almost quadrupled to $1.46 billion, or nearly 17% of the Company's total loans.  *Id*.  Further, by 2006, Business Credit Division loans yielded at least

360 basis points higher than other Company loans.  ¶81.  Despite the additional risk, defendants reassured the public that "[c]ommercial ... loans, exceeding $500,000, are individually evaluated for impairment" and that the Company's asset quality continued to be strong "in spite of the Company's continued loans portfolio growth."  ¶¶53, 55, 57-60, 62.

In apparent recognition of the increased risk, the Company established stricter guidelines for Board-level approval than necessary for other asset-based loans.  The Senior Credit Committee was tasked with reviewing and ratifying all loans in excess of $500,000, and with expressly approving all loans in excess of $15 million, originating from the Business Credit Division.  ¶¶7, 47. Further, the entire Board was charged with reviewing and ratifying Business Credit Division loans in excess of $15 million, and expressly approving those in excess of $50 million.  ¶¶47, 79.

**B.   Inyx's Business Credit Division Loans**

In 2005, the Company made the first of many commercial asset-based loans to Inyx.  The first 2005 loan to Inyx was for $46 million and consisted, in part, of a revolving credit limit secured by Inyx's accounts receivable and inventories.  ¶42.  Because of the size of the loan, it required Senior Credit Committee approval and Board ratification.

Over the next two years, Inyx became a major borrower from the Business Credit Division.  ¶43.  In 2006 alone, Westernbank's loans to Inyx comprised twenty-three percent of the bank's asset-based lending.  ¶81.  Secured only by assets and accounts receivable, loans to Inyx grew nearly $100 million throughout 2005, 2006 and

into 2007, ultimately reaching a total of approximately $142 million. ¶47.

> **C.   The Senior Credit Committee Wrongly Approves and the Board Wrongly Ratifies Inyx Loans Amounting to $142 Million**

As was typical of large asset-based loan transactions, the Business Credit Division closely monitored the value of Inyx's inventory and receivables by obtaining evidence of its daily sales, inventory purchases and cash payments, as well as reconciliation reports. ¶42. These efforts were confirmed by testimony taken during bankruptcy proceedings by Inyx subsidiaries. *Id*. A Company underwriter testified that Inyx's bank statements, cash reconciliations, inventory reports, accounts receivables and other information were examined by Westernbank during its regular audits of Inyx, occurring every 90-120 days on a rotating basis. *Id*.

On the basis of the above documents, certain invoices and receivables submitted for financing, which were actually "pre-billing" invoices, should have been rejected by Defendants. ¶43. Indeed, Company representatives identified inconsistencies in Inyx invoices as early as March 2006. *Id*. In August 2006, Company representatives participated in a call with Inyx representatives in which they discussed the "alarming amount of those accounts receivable that had shifted to the ineligible and the critical column." *Id*. Later that month, representatives from Inyx, including Inyx's CEO and other executives, traveled to Westernbank to meet and discuss accounts receivable aging with Westernbank management. *Id*. In October 2006, W Holding's officers and executives were advised by their auditors that Inyx refused to provide full and complete information, thus they could not complete

the audit.  *Id*.   Further, in November 2006, Inyx informed the president of the Business Credit Division that $37.6 million of Inyx accounts receivable were going to be written off by Inyx.  *Id*. Despite these known facts, Defendants continued to represent in Company filings that W Holding's asset quality was "strong" and that each individual loan was evaluated for impairment.   ¶59.

In the face of the above, rather than declaring default, Defendants continued to throw good money after bad, approving and lending millions more to Inyx on the basis of their accounts receivable and inventories throughout 2006 and into 2007.   ¶43. Not until June 2007, when the impairment had risen to at least $80 million, did Defendants disclose the massive loan impairment and collateral deficiency.   ¶¶5, 63, 65.   Due to the hidden collateral deficiencies, the Company announced that it would need to restate its financial statements issued between March 2006 and at least June 30, 2007.   ¶90.

## III. LEGAL STANDARDS FOR THE COURT'S DEMAND FUTILITY ANALYSIS

Under well-settled Delaware law,[6] a shareholder derivative plaintiff must allege either: (a) that he has made a demand on the nominal defendant's board of directors to take the requested action; or (b) the reasons for not making demand, i.e., the reasons why demand was futile.  *Aronson v. Lewis*, 473 A.2d 805, 808 (Del.

---

[6]   W Holding is a Puerto Rico corporation, and the substantive law of that state governs the demand futility analysis.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991).   As Puerto Rico does not have a developed set of laws and its demand statute is based on that of Delaware, plaintiff relies upon Delaware law throughout. *In re First Bancorp*, *Derivative Litig.* 465 F. Supp. 2d 112, 118 (D.P.R. 2006)("Because Puerto Rican corporate law was modeled after Delaware corporate law, the court turns to Delaware corporate law for the test of demand futility.").

1984), *overruled in part on other grounds sub nom., Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993). Where there is a board action or a conscious board decision to refrain from acting, demand is excused as futile where – under alleged facts and all reasonable inferences therefrom – a reasonable doubt[7] is created that, at the time the derivative suit was filed: (i) a majority of the directors are disinterested or independent in the challenged transaction;[8] *or* (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814.

In evaluating whether a demand would have been futile, the allegations in the complaint must be viewed as true and all reasonable inferences must be drawn in the light most favorable to plaintiffs. *See In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999) (applying Delaware law). Plaintiffs are not required to plead evidence, nor are they required to

---

[7]  "Reasonable doubt" exists when a shareholder has a "reasonable belief" that the board lacks independence or that the transaction was not protected by the business judgment rule. *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds sub nom.*, *Brehm*, 746 A.2d 244. Plaintiffs need not show they are likely to prevail on their claims, as the Delaware Supreme Court has expressly rejected a more stringent standard: "[W]e reject the defendants' proposal that ... we adopt ... a requirement that a plaintiff must demonstrate a reasonable probability of success on the merits." *Rales*, 634 A.2d at 934.

[8]  "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. A reasonable doubt as to disinterestedness exists if plaintiff can show that a director faces a "substantial likelihood" of liability. *Rales*, 634 A.2d at 936. Plaintiff may also prove interestedness by establishing that a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id.*

demonstrate proof of success on the merits to establish the futility of demand. *See*, *e.g.*, *Aronson*, 473 A.2d at 816 (holding that a plaintiff is required "only [to] allege specific facts ... not plead evidence" of demand futility).

Contrary to Defendants' suggestion that the Court must consider each allegation relevant to demand futility in isolation, it is necessary to evaluate the totality of the allegations in their proper context. *See McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001); *Cendant*, 189 F.R.D. at 128. Thus, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt, the totality of the allegations may be sufficient. *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) ("the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers"); *Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 WL 31888343, at *8 (Del. Ch. Dec. 18, 2002) (allegations that separately would not establish a reasonable doubt as to a director's independence or disinterestedness could, when taken together, raise such a doubt).

When this action commenced, the Board was made up of seven directors. Defendants concede that plaintiff need only raise a reasonable doubt as to four directors to adequately plead demand futility. Mot. at 16 n.14. As W Holdings' executive officers, including the CEO, President and Chief Investment Officer ("CIO") and First Vice President of Westernbank, director defendants Stipes, Maldonado and Dominguez have significant management responsibilities and therefore should be considered interested for demand futility purposes. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1080-81 (C.D. Cal.

2008)(finding directors were not independent for purposes of demand futility analysis because of significant management responsibilities and U.S. Securities and Exchange Commission filings stating directors could not be deemed independent).[9]   Thus, Plaintiff need only demonstrate that demand is futile as to one other director.   Taken in their totality, the Complaint's particular allegations establish a reasonable doubt as to all of the remaining directors.

**IV.   THE COMPLAINT'S PARTICULARIZED ALLEGATIONS OF FACT ESTABLISH THAT DEMAND IS FUTILE**

   **A.   Demand Is Futile Against the Senior Credit Committee Members for Failing to Exercise Valid Business Judgment in Approving Inyx Loans**

Demand is excused where the pleadings "create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." *Aronson*, 473 A.2d at 808.   Reasonable doubt is also apparent where allegations support the inference that a board has made "an unintelligent or unadvised judgment." *In re NVF Co. Litig.*, No. 9050, 1989 WL 146237, at *5 (Del. Ch. Nov. 22, 1989).   Further, plaintiff may raise a reason to doubt a director's disinterestedness by alleging facts demonstrating a "substantial likelihood" that the director will be held personally liable for the alleged misconduct.   *Rales*, 634 A.2d at 934-36; *Aronson*, 473 A.2d at 805.   For example, directors are deemed interested for purposes of pleading demand futility if they face a substantial risk of liability for violating their fiduciary duties.   *See Ryan v. Gifford*, 918 A.2d 341, 356 (Del. Ch. 2007); *Jackson Nat'l Life*

---

[9] *See also Request for Judicial Notice*, Exh. A at 4 (2007 Proxy Statement, stating that only Board members Tamboer, Ruiz, Del Rio, Frontera are independent), filed concurrently herewith.

*Ins. Co. v. Kennedy*, 741 A.2d 377, 389-90 (Del. Ch. 1999); *Malone v. Brincat*, 722 A.2d 5, 9-10, 14 (Del. 1998).   Here, plaintiff adequately alleges that defendants Stipes, Dominguez, Del Rio, Tamboer and Frontera failed to exercise valid business judgment by approving additional loans to Inyx and breached their fiduciary duties by making misleading statements concerning their oversight of the loan approval and review process.

> **1.   The Senior Credit Committee Knew or Were Reckless in Not Knowing of Inyx's Financial Problems**

Here, defendants Stipes, W Holding's CEO, Dominguez, a Westernbank First Vice President, Tamboer, Del Rio and Frontera, along with six additional members of Westernbank's senior management, served on the Company's Senior Credit Committee.  ¶46. These five Board members were tasked with approving loans in excess in $15 million and reviewing and ratifying all loans in excess of $500,000 originating from the Business Credit Division.  ¶¶7, 47, 78.  The Inyx loan grew over the Relevant Period, from $46 million to $142 million, as defendants continued to lend Inyx additional money based on their accounts receivable.  ¶¶42, 47.  Any reasonable investigation, pursuant to Senior Credit Committee's duties to review and approve the loans, would have turned up facts showing collateral impairments and problems with Inyx's long term financial viability.  ¶¶46, 49, 78.

Thus, in 2006 and 2007, the Senior Credit Committee would have been confronted with escalating and overwhelming evidence that the value of the collateral pledged by Inyx to secure its loans was overstated, including: (1) identification of "inconsistencies" in invoices and contracts provided by Inyx in March 2006 (¶¶43, 79); (2) identification by Defendants in August 2006 of an "alarming

amount" of aging accounts receivable that were becoming critical
(¶43); (3) outrageous claims starting in September 2006 that Inyx
would pay off its loans through financing from other sources (*Id.*);
(4) refusal by Inyx to complete its audit in October 2006 (*Id.*);
and (5) Inyx's notification in November 2006 and again in May 2007
that millions of the accounts receivable securing their loans
"probably" would not be collected (¶¶43, 78).

The facts above would have been known to the Senior Credit
Committee absent a conscious disregard of duty.  Notably, two of
the five Senior Credit Committee members – Stipes and Dominguez –
primary employment is with W Holding and/or Westernbank.  ¶¶15, 16,
81.[10]  Stipes is W Holding's Chairman of the Board and CEO, as well
as Westernbank's CEO and President. ¶15. Dominguez is Westernbank's
First Vice President for the Southern Region.  ¶16.  Each of these
directors had access to inside information, including information
concerning Inyx avoiding its audits and making wild representations
as to repayment, as part of their daily tasks of running the
Company. ¶¶43-47.  It defies belief that Stipes and Dominguez could
have ignored information concerning Inyx's financial troubles.

Inyx was also one of the Company's largest borrowers,
comprising twenty-three percent of the Business Credit Division's
outstanding loan portfolio, thus the Senior Credit Committee must
have kept track of funds lent to Inyx. ¶¶41, 42, 46. Further,
Inyx's audit avoidance would have called the ability of Inyx to pay

---

[10] A third director's, Maldonado's, primary employment is also with
W Holding.  Maldonado is W Holding's President and CIO.  ¶81.  As a
Board member, Maldonado would have been responsible for
ratification of loans in excess of $15 million and approval of
loans in excess of $50 million.  ¶¶47, 79.

back existing loans in question, preventing the Senior Credit Committee from approving yet more loans to Inyx. ¶43. The escalating notifications that Inyx's accounts receivable were uncollectible or *did not even exist* would have raised additional doubts about the viability of those receivables as collateral. ¶79. Finally, as reflected by the lower Board-level approval thresholds, the Senior Credit Committee knew that the asset based loans coming from the Business Credit Division were risky, and thus should have devoted additional attention in approving and ratifying them.  ¶¶41, 46, 47, 79.  Because asset-based loans were critical components of W Holding's business, these are exactly the kinds of high-level, "red flag" risks that a director is reckless in disregarding.

### 2.   The Senior Credit Committee Did Not Exercise Valid Business Judgment in Approving Additional Loans to Inyx

Under *Aronson*, demand is excused if the facts in the complaint raise a reasonable doubt that the transaction at issue "was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814.  The protections of the business judgment rules can only be "claimed by disinterested directors whose conduct otherwise meets the tests of business judgment."  *Id.* at 812. Further, "to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Id.*  Delaware courts have held that the business judgment rule does not protect a defendant when the challenged actions amount to gross negligence. *Aronson*, 473 A.2d at 812, *CALPERS*, 2002 WL 31888343, at *12.

By virtue of its approval and satisfaction of loans, the Senior Credit Committee must have been aware of the substantial and increasing evidence that Inyx could not pay back the loans it had already borrowed against its accounts receivables, yet alone additional loans. ¶¶42-47. Despite the warnings and actual knowledge detailed *supra*, however, the Senior Credit Committee continuously authorized and/or permitted the Company to lend Inyx additional funds.[11] ¶¶43, 46. Either the Senior Credit Committee members knew about the Inyx problems and approved additional loans or they were grossly negligent in ignoring these material facts. This approval could not have been a valid exercise of business judgment. *See CALPERS*, 2002 WL 31888343, at *12 (finding that where a board either knew of inaccurate data and relied on it, or were grossly negligent in not knowing of inaccuracies in data, board had not exercised valid business judgment).

Defendants argue that plaintiff's argument fails because the Complaint makes "conclusory assertion[s]" concerning the Senior Credit Committee's approval of the Inyx loans and has not pled facts showing they actually approved additional loans. *See* Mot. at 12-17. The Senior Credit Committee, however, was tasked with reviewing and/or approving these loans. ¶46. According to Company filings, the Senior Credit Committee met twelve times in 2006,

---

[11] Defendants assert that plaintiff has not sufficiently pled that the Senior Credit Committee approved and/or ratified the Inyx loans. Mot. at 12-13. After the first loan of $46 million, Inyx borrowed $96 million more over two years. ¶¶42, 47. To have remained under the $500,000 threshold for loans requiring no Senior Credit Committee review, the Company would have had to approve nearly *200* separate loans to Inyx. This defies belief, supporting the inference that the Senior Credit Committee knew or should have known of Inyx's financial difficulties.

indicating that they were an active committee. *Id*. By inference, the massive extensions of the Inyx lines of credit above the initial approval, totaling nearly $100 million of additional borrowing over the course of two years, would have been subject to Senior Credit Committee review. *Id*.[12]

Presuming the Senior Credit Committee members were fulfilling their fiduciary duties, they should have continued to evaluate and approve these loans.  ¶¶46, 78.  Defendants Stipes, Dominguez, Del Rio, Tamboer and Frontera's approval of additional loans after they knew or should have known about Inyx imminent financial failure was not an exercise of valid business judgment, thus demand is futile as to each.

> ### 3.   If They Did Not Approve the Inyx Loans, the Senior Credit Committee Faces Substantial Liability for Failing to Act in the Face of a Known Duty

Officers and directors of a corporation owe a fiduciary obligation to the company and its stockholders.  *See Jackson Nat'l Life*, 741 A.2d at 386.  It is a failure to act in good faith when a director consciously disregards a known duty. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006).  *See also Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (under Delaware law, a failure to act in good faith may be shown "where the fiduciary ***intentionally fails to act in the face***

---

[12]   In ruling on a motion to dismiss, the Court must draw all reasonable inferences in favor of plaintiff as the nonmoving party. *See In re New Valley Corp.*, No. 17649, 2001 WL 50212, at *4 (Del. Ch. Jan. 11, 2001); *Cendant*, 189 F.R.D. at 127. *See also In re Biopure Corp. Derivative Litig.*, 424 F. Supp. 2d 305, 308 (D. Mass. 2006) (finding that plaintiffs had met the *Aronson* test because they established, through inference, that the entire board concealed information regarding the corporation's core business issues, which subjected the board "to potential personal liability and removed the protective cloak of the business judgment rule").

*of a known duty to act, demonstrating a conscious disregard for his duties*").[13]  Thus, directors face liability where plaintiff alleges facts demonstrating that the directors consciously disregarded their fiduciary obligations to the company.

Importantly, as demonstrated *supra,* the Complaint alleges affirmative acts on behalf of the Senior Credit Committee in approving or reviewing and ratifying the Inyx loans.  ¶¶46, 78. Faithfully discharging their duties as members of the Senior Credit Committee would have required directors Dominguez, Tamboer, Stipes, Del Rio and Frontera to gather data, reports and management analysis to examine the Company's risk exposure and the creditworthiness of the borrower prior to approval.  ¶¶46, 78.  To ensure that W Holdings lent funds in a prudent, well-informed and well-collateralized basis, the Senior Credit Committee directors would have to have reviewed the financial viability of the borrower.  *Id*.  They would also obtain any additional information and reports from management as necessary to enable them to make an informed decision or recommendation to the whole Board about whether to lend funds.  ¶¶46, 47.  The Senior Credit Committee members either diligently reviewed this type of information in performing their decision making duties and took no action to prevent shareholder deception concerning collateral deficiencies and loan impairments, or they simply lied to shareholders concerning review and evaluation of loans for collateral impairment in their financial statements and fulfilling their loan approval duties in their proxy statements, and did not do their jobs.  *See*

---

[13]  Here, as throughout, all emphasis is deemed added and citations and footnotes are deemed omitted unless otherwise noted.

*In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) ("Where there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required."); *Countrywide*, 554 F. Supp. 2d at 1081-82 (demand futile as to directors who, charged with monitoring risk, failed to investigate). Thus, even if defendants Stipes, Dominguez, Tamboer, Del Rio and Frontera did not approve the Inyx loans, as Defendants suggest, they face a substantial likelihood of liability for conscious disregard of their duty to do so.

Because demand is futile as to defendants Stipes, Dominguez, Tamboer, Del Rio and Frontera, W Holding's motion to dismiss based on plaintiff's supposed failure to adequately plead the requisite reasonable doubt as to demand futility must be denied.

**B.   Demand Is Futile as to the Entire Board for Making False Statements Concerning the Board's Oversight of the Inyx Loans**

It is a breach of fiduciary duty for W Holding's directors to make false or misleading statements to shareholders about the Company. *See Malone*, 722 A.2d at 9 (holding that "directors who knowingly disseminate false information that results in corporate injury or damage" violate their fiduciary duties); *Ryan*, 918 A.2d at 356 ("[I]t is difficult to conceive of a context in which a director may simultaneously lie to his shareholders ... and yet satisfy his duty of loyalty.").

The entire Board represented in filings that it maintained adequate internal controls to monitor the value of their larger loans. ¶¶7, 52-62.   For instance, they stated in the Company's

April 24, 2006 and February 27, 2007 10-Ks[14] and May 10, 2006,
August 17, 2006, November 9, 2006 and May 8, 2007 10-Qs that the
"allowance for loans losses is based on ongoing quarterly
assessments" and that "significant loans (those exceeding $500,000)
are individually evaluated for impairment." ¶¶52-62. These
statements were false. Not only were Defendants failing to
evaluate and account for impairments in existing loans, they
actively continued to ratify bad loans to Inyx.[15] Further, on
January 30, 2007, they issued a press release claiming that "W
Holding's asset quality continues to be strong in spite of the
Company's continued loans portfolio growth." ¶59. Again, this
statement was false, because Inyx had already notified the Company
that certain accounts receivable were uncollectible, thus the
collateral was impaired. ¶43. Thus, the entire Board faces a
substantial likelihood of liability for breaching their fiduciary
duties and demand is futile.

## V.   PLAINTIFF HAS STATED A CLAIM FOR EACH CAUSE OF ACTION

A motion to dismiss for failure to state a claim upon which
relief can be granted pursuant to Federal Rules of Civil Procedure,
Rule 12(b)(6) ("Rule 12(b)(6)") will only be granted if, based
solely on the pleadings, "it appears *beyond doubt* that the
plaintiff can *prove no set of facts* in support of his claim which

---

[14] All Director Defendants signed these 10-Ks.

[15] The entire Board was charged with reviewing and ratifying
Business Credit Division loans in excess of $15 million, and
expressly approving those in excess of $50 million. ¶47. Five out
of seven directors were part of the Senior Credit Committee
responsible for evaluating and approving loans over $15 million.
The Board ratified the first Inyx loan of $46 million. As the
Company lent another $96 million over two years, by inference, the
Board would have ratified additional loans over $15 million.

would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *See also Judge v. City of Lowell*, 160 F.3d 67, 72 (1st Cir. 1998). In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in his favor. *See Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. *See Nollet v. Justices of the Trial Court of Mass.*, 83 F. Supp. 2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000).

Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless no law supports the claim made, the facts alleged are insufficient to state a claim or an insurmountable bar appears on the face of the complaint. Undeniably, the standard to be applied by a court in ruling upon a motion to dismiss places a heavy burden on the moving party in light of the liberal pleading standards of the Federal Rules of Civil Procedure. In this case, the Complaint clearly satisfies these standards and sets forth many claims upon which relief can be granted.

**A.  Plaintiff Has Stated a Claim Under Section 304 of the Sarbanes-Oxley Act of 2002**

In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court enunciated a four-factor test for evaluating whether a federal statute contains an implied private right of action. *Id*. at 78. The four-part test considers: (1) is plaintiff "one of the class for whose especial benefit the statute was enacted"; (2) "any indication of legislative intent"; (3) consistency "with the underlying purposes of the legislative scheme"; and (4) if the

- 19 -

cause of action is one traditionally relegated to state law, "so that it would be inappropriate to infer a cause of action based solely on federal law." *Id*.  While numerous cases, including the two Defendants cite (Mot. at 21), have not found a private right of action, Judge Hellerstein of the Southern District of New York has found an implied private right of action.  *See In re Escala Group, Inc*., No. 1:06-cv-03902-AKH, Hearing Transcript (S.D.N.Y. May 17, 2007)(Request for Judicial Notice, Exh. B).[16]   That thorough analysis should be followed here.

Defendant Stipes received $1.26 million in bonuses during 2005 and 2006, plus over $146,000 in other compensation.  ¶15.  The Company has announced that it will restate its financials due to the material non-compliance of financial statements, therefore plaintiff has pled facts sufficient to hold defendant Stipes liable under SOX 304.

**B.  Defendants Wasted Corporate Assets by Approving Loans to Inyx Which They Knew or Should Have Known Were Impaired**

The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes. *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).  Corporate waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."  *Brehm*, 746 A.2d at 263.

Defendants contend plaintiff's claim for corporate waste should be dismissed because Defendants conduct has not risen to the "unconscionable case where directors irrationally squander or give

---

[16] Should the Court wish to consider this issue in greater detail, plaintiff welcomes supplemental briefing.

away corporate assets." Mot. at 22.  This, however, is precisely
what plaintiff has claimed.  Despite knowledge that Inyx was
avoiding its audit requirements, falsifying invoices to continue
drawing against lines of credit, even making up stories about
obtaining funding to sufficiently collateralize their loans from
wealthy individuals, Defendants continued to approve Inyx loans –
funds which they **_knew_** they were unlikely to ever get back.  ¶¶43,
78.  Thus, defendants face liability for waste of corporate assets.

### C.  Plaintiff Has Adequately Pled a Claim for Unjust Enrichment

A claim for unjust enrichment involves the retention of a
benefit to the expense of another.  _Jackson Nat'l Life_, 741 A.2d at
393.  The elements for an unjust enrichment claim are: "(1) an
enrichment, (2) an impoverishment, (3) a relation between the
enrichment and impoverishment, (4) the absence of justification and
(5) the absence of a remedy provided by law." _Id._  Thus, the W
Holding defendants will be liable for the retention of the benefit
conferred upon them through undeserved compensation they received
by artificially inflating the Company's earnings.

Defendants argue that plaintiff has not pled a cause of action
for unjust enrichment because plaintiff has not alleged any cause
and effect connection between the approval of the Inyx loan and the
enrichment of any defendant.  Mot. at 23.  This is wrong.
Plaintiff has demonstrated how the Inyx loan approval led to
materially overstating the value of the Company, thus inflating the
officer defendants' bonuses.  ¶¶15, 63, 64, 70, 72.  Thus,
Defendants have been unjustly enriched at W Holding's expense and
plaintiff's claim for unjust enrichment should be upheld.

### D.   Plaintiff Has Adequately Pled a Claim for Violation of Title 14, Section 2727

A Section 2727 claim has four elements: (1) publication or disbursement of information regarding a corporation's condition or business, in writing; (2) falsity; (3) intent; and (4) injury. *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 328 (D.P.R. 1996).

Defendants argue that plaintiff has not pled a cause of action for violation of Section 2727 because he cannot show that the corporation was harmed and because he has not shown the requisite intent. Mot. at 23. Defendants, however, ignore plaintiff's detailed allegations concerning damages and Defendants' actions. First, plaintiff has demonstrated that the Company incurred damages from write-downs of the Inyx losses and the anticipated restatement due to unreported asset impairment losses. ¶¶5, 8. The Company has also been harmed by the need to bring suit against Inyx in order to recover any of the collateral securing the $142 million in loans. ¶43. The Company has been further harmed through undeserved bonuses paid to executives who knowingly made false statements concerning reviewing the Company's loan portfolio for collateral impairments and the overall health of the Company's asset holdings. ¶¶15, 63, 64, 70, 72. Second, as demonstrated *supra* Section IV.B., Defendants made false statements concerning their review of loans for collateral impairments and regarding the safety of the Company's assets, despite knowing of the falsity of such statements. Thus, plaintiff has demonstrated both damages and intent, and Defendants face liability for violation of Section 2727.

### E.   Plaintiff's Claims Against the Directors Are Not Barred by W Holding's Charter

Defendants argue that the purported exculpatory provision in W Holding's charter shields the Director Defendants from any personal liability. Mot. at 11. This is wrong. As an initial matter, protection from personal liability under an exculpatory provision should generally be raised as an affirmative defense. *In re Tower Air, Inc.*, 416 F.3d 229, 242 (Del. 2005) ("[T]he protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6).").

Defendants also ignore the explicit language of the exculpatory provision. By its terms, the exculpatory clause only protects the Director Defendants (not all defendants) "in cases of *monetary*,[sic] claims for damages resulting from the breach of the fiduciary duties." (emphasis added) *See* Mot., Exh. 2 at 2. Here, plaintiff alleges claims beyond fiduciary duty claims for money. Plaintiff also seeks *equitable* relief, as well as monetary relief.

Second, the exculpatory provision does not protect Defendants from the violations of the duty of loyalty alleged by plaintiff. "[W]hen a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory [charter] provision." *Alidina v. Internet.com Corp.*, No 17235-NC, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002).[17] As discussed herein, Defendants breached their fiduciary duty of loyalty by consciously disregarding their fiduciary duties as directors and officers. Thus, it would be

---

[17] The Company's exculpatory clause is virtually identical to that permitted under Delaware Section 102(b)(7).

improper for the Court to conclude as a matter of law that the directors acted in good faith, and that their actions constituted no more than mere carelessness, where plaintiff has pled more than mere carelessness in the Complaint. Thus, the Complaint should not be dismissed at the pleading stage based on any exculpatory provision.

## VI.   PLAINTIFF HAS STANDING TO BRING THIS ACTION

Defendants argue that plaintiff's Complaint should be dismissed because it does not allege contemporaneous ownership of W Holding stock for the period of plaintiff's allegations. Mot. at 6-7. Federal Rule of Civil Procedure 23.1 ("Rule 23.1") requires a plaintiff to "fairly and adequately represent the interests of shareholders ... in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a). Here, the Complaint alleges that Plaintiff owned W Holding stock at times relevant to this action. ¶13. Thus, plaintiff's allegation concerning his stock ownership satisfies the requirements of Rule 23.1. *See Plymouth County Ret. Ass'n v. Schroeder*, No. 07-04772 (ADS) (ETB), 2008 WL 4254151 (E.D.N.Y. Sept. 5, 2008) (holding a plaintiff is not required to indicate the specific dates or time periods during which he or she acquired stock at the motion to dismiss stage). Indeed, Rule 23.1 was never designed as a procedural bar to meritorious derivative actions. The Supreme Court has recognized that Rule 23.1 was not written "in order to bar derivative suits" but instead "was originally adopted ... as a means to discourage 'strike suites' by people who might be interested in getting quick dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to

get rid of them." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966). Here, these claims are meritorious. Should Defendants want additional information concerning plaintiff and his holdings, they can serve discovery on plaintiff to obtain it.

Because, on a motion to dismiss, the court is required to take all well-pleaded allegations as true and construe them in a light most favorable to the non-moving party, *see*, *e.g.*, *Langadinos*, 199 F.3d at 69, plaintiff has adequately alleged his standing at this stage of the proceedings.[18]

**VII. CONCLUSION**

Plaintiff respectfully requests Defendants' Motion to Dismiss and their request for fees and costs be DENIED.

DATED: November 12, 2008          Respectfully submitted,

ORLANDO CABRERA LAW OFFICES

s/Orlando Cabrera-Rodriguez
ORLANDO CABRERA-RODRIGUEZ

P.O. Box 360670
San Juan, Puerto Rico 00936-0670
United States of America
Telephone: (787) 763-3434
Facsimile:  (787) 767-8335
Email:  cabreralawpr@aol.com

ROBBINS UMEDA & FINK, LLP
MARC M. UMEDA
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

---

[18] If Defendants' motion is granted, plaintiff respectfully requests that he be permitted to file an amended complaint to address any identified infirmities. Fed. R. Civ. P. 15(a) ("the court should freely give leave [to amend the pleadings] when justice so requires").

```
LAW OFFICE OF ALFRED G. YATES,
JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219-1649
Telephone: (412) 391-5164
Facsimile:  (412) 471-1033

Attorneys for Plaintiff
```

371785_17.DOC

## CERTIFICATE OF SERVICE

I hereby certify that on this the 12th day of November, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Eric Perez-Ochoa
epo@amgprlaw.com


s/Orlando Cabrera-Rodriguez
ORLANDO CABRERA-RODRIGUEZ

ORLANDO CABRERA LAW OFFICES
U.S.D.C. 209913
P.O. Box 360670
San Juan, Puerto Rico 00936-0670
United States of America
Telephone: (787) 763-3434
Facsimile:  (787) 767-8335
Email:  cabreralawpr@aol.com