1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF PUERTO RICO

**HUNTER WYLIE, derivatively on behalf of W HOLDING COMPANY, INC.,**

**Plaintiff,**

**v.**

**FRANK C. STIPES, et al.,**

**Defendants.**

**CIVIL NO. 08-1036 (GAG)**

## OPINION AND ORDER

Plaintiff Hunter Wylie ("Plaintiff"), derivatively on behalf of W Holding Company, Inc. ("W Holding"), brought suit against certain officers and directors of W Holding for alleged violations of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201 *et seq.*; breach of their fiduciary duties as directors of W holding; waste of corporate assets; unjust enrichment; and violations of Puerto Rico General Corporations Law of 1995, P.R. Laws Ann. tit. 14, §§ 2601 *et seq*.  Presently before the court is the Special Litigation Committee's motion to terminate the derivative suit (Docket No. 96) based upon the Special Litigation Committee's Determination and Recommendation (Docket No. 98).  The committee's motion is joined by defendants' Frank C. Stipes, Pedro R. Dominguez, Freddy Perez Maldonados, Norberto Rivera, Ramon Rosado, Cesar A. Ruiz, Cornelius Tamboer, Hector L. Del Rio, Juan C. Frontera, and Ricardo Hernandez (collectively, "Defendants") motion to dismiss or in the alternative for summary judgment (Docket No. 172).

## I.    Relevant Factual & Procedural Background

The plaintiff in this derivative action is, and at all relevant times has been an owner and holder of W Holding stock.  W Holding is a Puerto Rico corporation that operates as the holding company for its wholly owned subsidiary Westernbank, Puerto Rico ("Westernbank").  Westernbank

Civil No. 08-1036 (GAG)

is a commercial bank operating in Puerto Rico that offers an array of business and consumer financial products and services, including banking, trust, and brokerage services.  Westernbank operates five divisions, including the Westernbank Business Credit Division ("WBCD"), which conducts commercial asset-based lending activities.  Defendants are officers and directors of W Holding.

Plaintiff alleges that, from April 2006 until the present ("the relevant period") Defendants directed W Holding to represent that its filings with the United States Securities and Exchange Commission ("SEC") were drafted in accordance with generally accepted accounting procedures ("GAAP").   In particular, Defendants allegedly directed W Holding to affirm that its loan impairments for loans originated by Westernbank were classified in accordance with the Statement of Financial Accounting Standards ("SFAS") No. 114.  This particular standard provides that a loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.  Under this standard, a creditor should apply its normal loan review procedures in making a judgment about whether it is probable that it will be unable to collect all amounts due according to the contractual terms of the loan agreement.  Plaintiff contends that W Holding was not in compliance with GAAP and SFAS No. 114 because it was overstating the value of Westernbank's loan portfolio.  These overstatements occurred as a result of Westernbank's failure to discover that a number of its loans, including loans to Inyx, Inc. ("Inyx") for over $100 million, were not sufficiently collateralized and would be uncollectible.

Throughout the relevant period, Westernbank conducted asset-based lending activities that relied upon non-existent collateral for the repayment of loans originated by it.  This information came to light on June 26, 2007, when W Holding announced that a large asset-based loan was impaired due to an $80 million collateral deficiency.  While not disclosed initially, it was later discovered that W Holding was referring to loans made to Inyx.  On February 6, 2008, W Holding disclosed that the actual collateral deficiency was not $80 million, as originally reported, but $105

Civil No. 08-1036 (GAG)

1   million.  W Holding further announced that, due to these unreported asset impairment losses, its

2   financial statement for the periods from September 2006 to March 2007, were materially false and

3   would need to be restated.  As a result of the losses incurred during the relevant period, W Holding's

4   credibility with investors deteriorated and analysts downgraded its stock.

5        Plaintiff filed his amended complaint on June 10, 2008 (Docket No. 15).  Defendants moved

6   to dismiss the derivative action on August 25, 2008 (Docket No. 27).  In its opinion and order

7   (Docket No. 33) the court granted in part and denied in part Defendants' motion to dismiss,

8   dismissing Count I against all defendants and Count IV against certain named defendants.

9        On March 24, 2009, W Holding formed a Special Litigation Committee ("SLC") to

10  investigate Plaintiff's derivative suit.  The Board appointed two members to the SLC: Alberto Baco

11  ("Baco") and Enrique Gonzalez ("Gonzalez"), who joined the Board on March 29, 2009 and

12  February 25, 2008, respectively.  Counsel for the SLC was retained on March 28, 2009.  The

13  appointed counsel, Carlos Concepcion ("Counsel" or "Concepcion"), hired Francisco Gomez

14  ("Gomez") to consult on the SLC's investigation.  The SLC launched an investigation into the

15  allegations made by Plaintiff.  Following its investigation, the SLC concluded that it was in the best

16  interest of W Holding to dismiss Plaintiff's derivative claim.  It compiled a 182-page report detailing

17  its investigation and conclusions and submitted it under seal to the court along with a motion to

18  terminate (Docket Nos. 96 & 98) on December 15, 2009.  The court denied W Holding's motion

19  without prejudice, permitting the parties to conduct discovery on the issues raised in the SLC's

20  report.  (See Docket No. 135.)  On April 12, 2011, the SLC, on behalf of W Holding, renewed its

21  previous motion to dismiss (Docket No. 171).  Defendants filed a separate motion to dismiss or in

22  the alternative for summary judgment, which adopted the SLC's report (Docket No. 172).  These

23  motions were opposed by Plaintiff's memorandum in opposition (Docket No. 181).  Defendants and

24  W Holding filed separate replies to Plaintiff's opposition (Docket Nos. 188 & 189).

25  **II.    Standard of Review**

26       A special litigation committee ("SLC") has the power to terminate a derivative action to the

27

28                                          3

Civil No. 08-1036 (GAG)

1   extent permitted by the state of incorporation.  See Burks v. Lasker, 441 U.S. 471, 486 (1979).

2   Puerto Rico has modeled its corporate statutes after Delaware corporate law, and thus, derives its

3   controlling precedent from Delaware Supreme Court decisions.  See Marquis Theatre Corp. v.

4   Condado Mini Cinema, 846 F.2d 86, 91 (1st Cir. 1988).  When considering a motion to terminate

5   a derivative suit premised upon the recommendation of a special litigation committee, the standards

6   articulated in Zapata Corp. v. Maldonado , 430 A.2d 779 (Del. 1981) are controlling.  Under Zapata,

7   such a motion is not considered a motion to dismiss under Rule 12(b), nor is it a motion for

8   summary judgment under Rule 56.  Instead, the Court describes it as "a hybrid summary judgment

9   motion for dismissal."  430 A.2d at 787.

10       In Zapata, the Delaware Supreme Court set forth a two-step analysis applicable to motions

11   to terminate derivative suits based on a special litigation committee's recommendation.  430 A.2d

12   at 788.  First, the court inquires into the committee's independence and good faith, as well as the

13   bases supporting its conclusions, using a standard analogous to a motion for summary judgment.

14   Id.  "The corporation should have the burden of proving independence, good faith and a reasonable

15   investigation, rather than presuming independence, good faith and reasonableness."  Id.  If it is

16   unable to do so, the court shall deny the corporation's motion.  However, if the court is satisfied

17   under the standards of Rule 56 that the committee was independent and showed reasonable bases

18   for its conclusions, the court may proceed to the next step.  Id. at 789.

19       As to the second step, "[t]he Court should determine, applying its own independent business

20   judgment, whether the motion should be granted."  Id.  In conducting this inquiry, the court's

21   "function is to exercise its own independent business judgment in striking a balance between

22   'legitimate corporate claims' as expressed in the derivative shareholder suit and the corporation's

23   best interest as ascertained by the Special Litigation Committee."  Kaplan v. Wyatt, 484 A.2d 501,

24   508 (Del. Ch.1984).  If the court finds that the result reached by the SLC was "irrational" or

25   "egregious" the court may disregard the SLC's determination and deny the motion to terminate the

26   suit.  See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., 1997 WL 305829 at *2 (Del. Ch. May

27

28                                          4

**Civil No. 08-1036 (GAG)**

1   30, 1997).

2   **III.      The SLC's Report**

3           Along with its report, the SLC filed an executive summary of its investigation and

4   conclusions (Docket No. 98-2).  The SLC concluded that the basis for the derivative suit –the

5   downgrading of W Holding's stock as a result of W Holding's restatement of its financials for the

6   periods between October 2005 and December 2007– was a necessary response to a structured fraud

7   perpetrated by Inyx.  In reaching this conclusion, the SLC members and its Counsel conducted an

8   independent, in-depth, and extensive factual investigation, including interviewing thirty three (33)

9   of W Holding's current and former directors, officers, employees, and outside advisors, as well as

10  reviewing thousands of pages of documents.

11          The SLC received the cooperation of W Holding, W Holding's current outside counsel, and

12  all of the individual defendants named in the action, with the exception of Jose Manuel Biaggi, W

13  Holding's former President and CEO of the bank during the relevant period.  The SLC determined

14  that Biaggi's lack of cooperation would not materially impede its investigation.  In conducting its

15  investigation, the SLC utilized the investigative materials generated by W Holding's consultants

16  during its own internal investigations, including the KPMG forensics practice section and the local

17  independent law firm which had been hired by W Holding's audit committee to perform the

18  independent investigation into the Inyx fraud.

19          The SLC also reviewed depositions of all the officers, directors, and former employees of

20  WBCD, who participated in the events surrounding the Inyx loan.  Several of the former WBCD

21  employees, who the SLC was unable to interview directly, described in these previous depositions

22  the facts and circumstances surrounding the Inyx loan events.  These depositions were obtained via

23  discovery requests taken in the <u>Westernbank vs. Inyx, et al.</u> case.  The SLC determined that review

24  of these prior depositions was sufficient to permit it to perform its mandate.  The SLC was also

25  unable to obtain the cooperation of Fernando Nido– one of the partners in charge of W Holding's

26  independent audit engagement.  However, the SLC determined that Nido's cooperation was not

27  necessary to its investigation.

28                                                                      5

**Civil No. 08-1036 (GAG)**

The court will further analyze the specific factual findings of the SLC when considering the committee's findings against the standard established in <u>Zapata</u>.

**IV.   Legal Analysis**

    **A.   Good Faith Investigation of the SLC**

A corporation's motion for summary dismissal is governed by traditional summary judgment standards. <u>Zapata</u>, 430 A.2d at 788 ("[T]he moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law."). Therefore, under the first step in <u>Zapata</u>, the corporation must prove that there is no genuine issue of material fact as to the SLC's independence, good faith, or the reasonableness of its investigation and conclusion. In order to maintain its burden of establishing independence, the SLC must persuade the court that it based its decision "on the merits of the issue rather than being governed by extraneous considerations or influences." <u>Kaplan</u>, 499 A.2d at 1189. In deciding whether or not a committee member can act independently, Delaware courts have looked to a committee members past or present business and social dealings with the defendants. <u>See</u> <u>In re Oracle Corp. Derivative Litigation</u>, 824 A.2d 917, 930 (Del. Ch. 2003). The court "investigates the member's personal interest in the disputed transactions and 'scrutinizes the members' relationship with the interested directors.'" <u>Sutherland v. Sutherland</u>, 2008 WL 1932374 at *4 (Del. Ch. May 5, 2008). "[A] director may be compromised if he is beholden to an interested person. Beholden in this sense does not mean just owing in the financial sense, it can also flow out of 'personal or other relationships' to the interested party." <u>In re Oracle</u>, 824 A.2d at 938-39.

Plaintiff contends that there are genuine issues of material fact as to the SLC's ability to conduct an independent analysis because of (1) Gonzalez's commercial ties to certain named defendants; and (2) the manner in which the SLC was formed.

    **1.   Gonzalez's Ties to the Defendants**

In its motion, the SLC admits that commercial ties exist between Gonzalez and two of the named defendants, Cornelius Tamboer and Hector L. Del Rio. Upon the formation of the SLC it was learned that Gonzalez performed auditing services for these defendants. Approximately sixteen

**Civil No. 08-1036 (GAG)**

percent (16%) of Gonzalez's accounting firm revenues stemmed from services performed for Tamboer and Del Rio's shared business.  (See Docket No. 181-4 at 15, L. 17- 21.)  In his deposition, Gomez testified that this commercial relationship was considered and it was decided that, although Gonzalez believed he could remain independent, he would not partake in any investigation into the actions of defendants Tamboer and Del Rio. (See Docket Nos. 181-4 at 16, L. 1-15; 181-3 at 12, L. 7-25.)

Plaintiff relies upon the courts ruling in In re Oracle to support his argument that Gonzalez's commercial ties to two of the named defendants create a genuine issue of material fact as to his ability to independently assess Plaintiff's claims.  824 A.2d at 930   In Oracle, the Delaware Court of Chancery denied the Oracle SLC's recommendation to dismiss a claim because it believed that there existed a genuine issue of fact as to whether the committee members' connections to defendants could have effected their independent business judgment.  According to the facts, the Oracle SLC failed to disclose several significant relationships between the members of the committee and the insider defendants.  During discovery it was revealed that the two SLC members –both of whom are professors at Stanford University– were being asked to investigate fellow Oracle directors who have important ties to Stanford.[1]  In making its findings, the court pointed to several

---

[1] Among the directors who were accused of insider trading were:

(1) another Stanford professor, who taught one of the SLC members when the SLC member was a Ph.D. candidate and who serves as a senior fellow and a steering committee member alongside that SLC member at the Stanford Institute for Economic Policy Research or "SIEPR"; (2) a Stanford alumnus who has directed millions of dollars of contributions to Stanford during recent years, serves as Chair of SIEPR's Advisory Board and has a conference center named for him at SIEPR's facility, and has contributed nearly $600,000 to SIEPR and the Stanford Law School, both parts of Stanford with which one of the SLC members is closely affiliated; and (3) Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, and who was considering making donations of his $100 million house and $170 million for a scholarship program as late as August 2001, at around the same time period the SLC members were added to the Oracle board.

Civil No. 08-1036 (GAG)

factors that militated its decision: (1) The Oracle SLC's failure to identify the extent of the connections in its report and recommendation; (2) the extensive nature of the connections between the SLC members and the interested defendants; and (3) the conscious or subconscious role these connections played in influencing the committee's decision. Oracle, 824 A.2d at 937, 945.

The facts of the case at hand are quite different than those recognized in Oracle. For one, the SLC's report reflects Concepcion's efforts to identify and investigate any relationships that could potentially effect the committee's independent judgment. (See Docket No. 98-3 at 17-19.) The committee identified Gonzalez's commercial relationships and excluded him from the investigation into the actions of Tamboer and Del Rio. (See id. at 18.) Regardless, the existence of these relationships, without more evidence of bias, would not necessarily call into question Gonzalez's independence. See Kaplan, 499 A.2d at 1189 (a committee member's association with businesses that transact with defendants did not establish a lack of independence without evidence of personal dealings or evidence as to how the affiliations would influence independence). Moreover, when applying Delaware law, the court in Johnson v. Hui, 811 F. Supp. 479 (N.D. Cal. 1991), held that a committee can retain its independence even if one of the two members is a director with considerable ties to other director defendants. The Johnson court held that even if one of the members was tainted, "there is no indication that the objectivity of [the other member] or committee counsel were overborne by the arguments or conduct [of the tainted member]." 811 F. Supp. 479, 487 (citing Kaplan, 499 A.2d at 1189). Similarly, in this case, Plaintiff has presented no evidence that Gonzalez's alleged bias affected the judgment of the other members of the SLC.

Finally, the evidence before the court demonstrates that the outside influences in this case were not as substantial as in Oracle. In his deposition, Gomez testified that he determined that the 16% of the firms revenue, which came from services provided to Tamboer and Del Rio, was not a sufficient concentration of revenue as to render Gonzalez non-independent. (See Docket No. 181-4 at 15, L. 17-24.) Gomez further testified that his independence determination took into

_____

In re Oracle Corp., 824 A.2d at 920-21.

Civil No. 08-1036 (GAG)

consideration Gonzalez's report that he was not personally involved in the audit engagement. (See id. at 15, L. 17-24.)

The court agrees with the SLC's determination that Gonzalez's commercial ties to two of the defendants were not so sufficient as to render him impartial in his duties.  Moreover, the committee' s decision to recuse Gonzalez from investigations into Tamboer and Del Rio speaks to the SLC's efforts to remain impartial in conducting its duties.  Accordingly, the court finds that there is no genuine issue of material fact with regard to the effect of Gonzalez's relationship's on the SLC's ability to remain independent.

### 2.       The Formation of the SLC

Plaintiff also avers that the manner in which the SLC was formed raises serious questions as to its ability to independently assess the claims against the named defendants.  Plaintiff alleges the SLC was formed with a pre-determined outcome in mind.  In supporting his argument, Plaintiff highlights that the SLC retained counsel and its consultant nearly two weeks before the Board had resolved to create a SLC and before Baco had even joined the Board.  (See Docket No. 181 at 18.) Plaintiff also contends that the SLC's delegation of its investigation duties to Concepcion and Gomez further demonstrates the committee's lack of independent judgment.  (See id.)

In assessing Plaintiff's averments, the court is unable to understand how these evidentiary proffers demonstrate that the Board was formed with a pre-determined outcome.  For one, Gonzalez testified that he was the one that contacted Concepcion (see Docket No. 181-3 at 11, L. 8-20.), thus counsel was not retained by a party outside of the SLC.  Furthermore, at the time of his appointment, Baco had been approved as a Board member and was asked to be a part of the SLC because he was the only other uninterested officer.[2]  (See id. at 11, L. 9-15.)

The court also disagrees with  Plaintiff's allegations of improper delegation.  The SLC did

_____

[2] The fact that Baco was selected without being at the Board Meeting where the SLC was discussed bolsters his independence on the subject as opposed to demonstrating the existence of a pre-determined bias.

9

Civil No. 08-1036 (GAG)

not act improperly in delegating tasks of the investigation to its appointed counsel and consultant. See Katell v. Morgan Stanley Group, Inc., 1995 WL 376952 at *10 (Del. Ch. June 15, 1995) (recognizing that the SLC "can select any agent to perform its duties . . . as long as the agents can perform their assigned tasks competently."). The evidence presented to the court, demonstrates that both Concepcion and Gomez were competent to participate in the SLC investigation. (See Docket Nos. 181-3 at 10, L. 6-17, at 11, L. 8-20; 181-4 at 6, L. 16-23.) Furthermore, both Gonzalez and Baco were consistently involved in the investigation process and were instrumental in making the final substantive judgments. (See Docket Nos. 181-3 at 13, L. 8-13; 189-3 at 8; 98-3 at 20, ¶ V, 25, ¶ F.) See Invs. v. TLC Beatrice Intern. Holdings, Inc., 1997 WL 305829 at *12 (Del. Ch. May 30, 1997) ("Where there is no evidence of overreaching by counsel or neglect by the SLC, the court ought not second guess the SLC's decisions regarding the role which counsel played in assisting them in their task."). As Plaintiff has failed to provide evidence as to the agents' incompetence or the committee members lack of oversight, the court sees nothing improper about the SLC's delegation of these duties. Accordingly, the court finds that the Plaintiff has failed to provide evidence that the SLC was formed with a pre-determined outcome.

### 3.     The Thoroughness of the SLC's Investigation

Under the next step of the first prong of the Zapata test, the court must decide whether the SLC "in good faith conducted a reasonable investigation upon which it based its conclusions," by examining the thoroughness of the investigation. Kaplan, 499 A.2d at 1188. Plaintiff contends that the SLC's investigation was not sufficiently thorough as it was Counsel and Gomez that conducted the majority of the investigation.

A plaintiff may successfully challenge the SLC's good faith reliance on counsel by showing that the SLC neglected its duties in connection with the investigation. To support his contentions that the SLC acted improperly, Plaintiff cites Davidowitz v. Edelman, 583 N.Y.S.2d 340 (N.Y. Sup. Ct. 1992). In Davidowitz, the court did not defer to the judgment of the special litigation committee, holding that:

**Civil No. 08-1036 (GAG)**

> The investigation mounted by the committee did not fulfill the requirements of a thorough and reasonable inquiry. While the committee members are entitled to rely upon the advice of counsel, only one member of the [ ] committee attended one interview. The committee did not join in their counsel's investigation or review, save in the most perfunctory manner.

Davidowitz, 583 N.Y.S. 2d at 344.  The court once again finds that Plaintiff's reliance on its cited precedent is misguided.  The evidence before the court demonstrates a more involved role by the SLC, than that which was recognized in Davidowitz.  With regard to interviews, either one or both of the SLC members were in attendance during a majority of the interviews conducted by Counsel.[3] (See Docket Nos. 98-3 at 20, ¶ V; 181-2 at 13-14.) Furthermore, for those interviews in which a committee member was not in attendance, the SLC met with Counsel and Gomez to discuss what was said during the interview.  (See Docket No. 181-3 at 13, L. 8-13.)  Moreover, as previously recognized by the court, a committees's "heavy reliance on its competent counsel does not render its investigation unreasonable." Katell, 1995 WL 376952 at *28; see also In re Take-Two Interactive Software, Inc. Derivative Litigation, 2009 WL 1066251 at *6-7 (S.D.N.Y. Apr. 21, 2009) (applying Delaware law and holding that an SLC's decision not to conduct or attend any interviews, or conduct document review directly did not create an issue of fact as to reasonableness of investigation.) Therefore, members of the SLC were under no duty to be physically present at all of the interviews.

Plaintiff further questions the thoroughness of the SLC's investigation by highlighting its failure to interview WBCD employees.  As to this allegation, the SLC contends that they attempted to contact all the of the WBCD employees who may have had information on the Inyx loan.  (See Docket No. 189-1 at 7.)  However, the SLC was only able to gain the cooperation of two former

---

[3] There are some inconsistencies between the written reports and deposition testimonies with regard to the number of interviews attended by the SLC members.  However, in its opposition (Docket No. 181) Plaintiff recognizes that of the twenty-four interview memos produced by the SLC, only ten were conducted without the presence of any SLC member.  (See Docket No. 181 at 20, n. 12.)

Civil No. 08-1036 (GAG)

WBCD employees, while the others, upon advice from counsel, refused to be interviewed.[4] Contrary to Plaintiff's allegations, there is no evidence presented that the SLC was granted the authority to offer concessions or immunity to WBCD employees that agreed to be interviewed. Therefore, the court finds that the SLC's failure to procure statements from uncooperative parties does not call into question the good faith of its investigation. See In re Take-Two, 2009 WL 1066251 at *8 (SLC's failure to interview uncooperative critical witnesses did not invalidate committee's conclusions).

In light of the previously identified facts, the court finds that the SLC conducted a sufficiently thorough investigation in reaching its conclusions.

### 4. The Reasonableness of the SLC's Recommendations

In the final step of the first prong of the Zapata test, the court must decide whether, based on its investigation, the SLC's recommendations were reasonable. The court must determine whether "the report of the committee appears to be comprehensive and well documented and gives indication of a reasonable and thorough investigation of the plaintiff's allegations." Kaplan, 484 A.2d at 519. When applying this analysis, the court must make sure that in making its recommendation the SLC acted in the best interest of the corporation. Id. at 506.

Plaintiff contends that the record compels a substantial doubt that the SLC's conclusions and recommendations are reasonable and made in good faith. Plaintiff argues that, in conducting its investigation, the SLC failed to consider important findings that were inconsistent with its recommendation of dismissal. For example, Plaintiff contends that the SLC ignored the court's previous opinion and order (Docket No. 33), which denied in part the defendant's motion to dismiss. However, Plaintiff's reliance upon the language cited in the court's opinion and order is misguided. In considering the defendant's motion to dismiss (Docket No. 27) the court applied the 12(b)(6) standard, which mandates that the court assume as true all well pleaded facts in the complaint. See

---

[4] To gain more information on the Inyx loan from the WBCD employees that refused to cooperate, the SLC utilized the deposition testimonies obtained from the discovery request in the Westernbank v. Inyx, et al. case. (See Docket No. 98-2 at 3.)

**Civil No. 08-1036 (GAG)**

1
2
3
4
5
6
7

Parker v. Hurley, 514 F.3d 87, 90 (1st Cir. 2008).  In applying this standard, the court's job "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984).  In contrast, the SLC was tasked with independently reaching its own conclusions based on all the evidence that it had before it. Therefore, the SLC acted correctly by not according great weight to the court's previous opinion and order (Docket No. 33).

8
9
10
11
12
13
14
15
16
17

Plaintiff also questions the reasonableness of the SLC report by highlighting a number of the committee's findings that are inconsistent with it's ultimate recommendation of dismissal.  These findings, which were made after the discovery of the Inyx fraud, include: (1) the insufficient scope of Loan Credit Quality review; (2) the fact that several advances to Inyx exceeded the credit limit; (3) deficiencies in the ability to prevent and detect instances of circumvention of internal controls; (4) deficiencies in detecting fraud with respect to borrowers; and (5) a lack of reporting of relevant events concerning the Inyx matter to those responsible for preparing financial statements and monitoring risk.  (See Docket No. 98-3 at 73.)  Plaintiff argues that the committee's failure to examine how these deficiencies came to be or were allowed to exist calls into question the good faith and reasonableness of its conclusions.

18
19
20
21
22
23
24
25
26
27

Plaintiff alleges that the defendants ignored numerous indications of the lack of oversight at W Holding and failed to have in place sufficient internal controls and procedures to monitor WBCD's practices.  To establish a failure of oversight under Delaware law a plaintiff must demonstrate "either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of . . . ."  In re Caremark Intern Inc. Derivative Litigation, 698 A.2d 959, 971 (Del. Ch. 1996).  With regard to the "should have known" prong, the Caremark court went on to state that "only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a

28

13

necessary condition to liability." Id.  In Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362 (Del. Supr. 2006), the Delaware Supreme Court affirmed the Caremark court's articulation of the necessary conditions predicate for director oversight liability.  See Stone, 911 A.2d at 370.  "To meet the standard established in Stone, to show directorial liability where there was a reporting and information system in place, the plaintiffs would need to show that the directors knew of the inadequacies and failed to act." In re Sonus Networks, Inc, Shareholder Derivative Litigation, 499 F.3d 47, 70-71 (1st Cir. 2007) (citing Stone, 911 A.2d at 370.)  "[T]he directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both . . . . " Stone, 911 A.2d at 373.  "[A]bsent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." Caremark, 698 A.2d at 969.

In accordance with the above-cited law, the court finds the SLC's recommendations to be reasonable.  The report of the committee appears to be comprehensive and well documented and gives indication of a reasonable and thorough investigation of the plaintiff's allegations.  The record produced by the SLC indicates that "the corporation's information systems appear to have represented a good faith attempt to be informed of relevant facts." Caremark, 698 A.2d at 971. During the relevant period the Board had in place internal controls over loan initiation and monitoring at WBCD.  (See Docket No. 98-3 at 70-72.)  Between the years of 2005-2007 an Auditing Committee, consisting of four directors, held 22 formal meetings with W Holding's outside auditors. (See id. at 70.)  The committee received and reviewed annual management letters from W Holding's outside auditors.  In addition, the Board held 12 meetings each year from 2005-2007, in which the Board members received updates on W Holding's financial results.  (See id. at 72.)  The Board also had in place a Senior Credit Committee, which was required to approve any loan over $20 million dollars ($15 million for the WBCD).  (See id. at 70.)  The fact that these auditing systems proved to be ineffective in preventing the Inyx fraud from occurring is not the standard the

**Civil No. 08-1036 (GAG)**

1
2
3

court uses to assess liability.[5]  See Stone, 911 A.2d at 373 (rejecting attempt to "equate a bad outcome with bad faith" when considering directors' liability).  Instead, when applying Delaware law, the First Circuit has recognized that

4
5
6

> [e]xamples of the kind of allegations necessary to show conscious neglect of the duty to supervise the company's financial reporting would be: "contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."

7
8
9
10

Sonus, 499 F.3d at 67 (citing Guttman v. Huang, 823 A.2d 492, 507 (Del. Ch. 2003)).  In recommending dismissal, the SLC identified the existence of special auditing committees and highlighted the extent of the work done by them.  Thus, in light of the applicable law, the SLC's recommendations were reasonable.

11
12
13
14
15
16
17
18
19
20
21
22

Plaintiff also attacks the reasonableness of the SLC's recommendation by pointing out that the SLC has not acted on any of its other conclusions found in the report.  According to its report, the SLC suspected that certain bank personnel made fraudulent misrepresentations to bank management for the purpose of increasing the amount of funds that were loaned to Inyx.  Plaintiff asserts that, in spite of these findings, the SLC has not recommended that W Holding pursue these individuals in civil litigation, nor has it forwarded its findings to the authorities for a criminal investigation.  Regardless of whether these allegations are true, the court fails to see how these facts undermines the reasonableness of the SLC's recommendations.  The SLC's duty was to assess the validity of the claims against the named defendants, and determine if proceeding was in the best interest of the corporation.  The SLC completed this task by conducting a thorough investigation into the relevant parties and concluding that the named defendants were likely not legally responsible for the losses suffered by W Holding.  Therefore, the court finds that the SLC's failure to take actions

23
24

-------

25
26
27

[5] Furthermore, following the losses that occurred as a result of the Inyx loan fraud, the Board implemented stricter oversight procedures.  (See Docket No. 98-3 at 74-83.)   The Boards action, although it occurred after the fact, indicates that once the inadequacies had been identified the Board acted to remedy them.

28

**Civil No. 08-1036 (GAG)**

independent of its mandated duties does not call into question the reasonableness of its recommendations.

**B.     The Court's Own Independent Judgment**

The court has carefully considered the evidentiary record supplied by the SLC report and declines to apply the second discretionary step of the Zapata analysis. See Katell, 1995 WL 376952 at * 13.  Based on the court's previous findings, this does not appear to be a case in which the "result reached was [so] 'irrational' or 'egregious'" as to compel the court to second guess the recommendation of the SLC.  Carlton Invs., 1997 WL 205829 at *2.  Based on the record presented, this court finds that the SLC acted rationally and with a good faith belief that its decision was in the best interest of W Holding.  The SLC was comprised of two competent unbiased members who, with the aid of competent counsel, reviewed the record culled from numerous documents and interviews and concluded that the derivative suit was not in the best interest of the corporation.  Accordingly, the court adopts the SLC's recommendation on behalf of the corporation, and **DISMISSES** Plaintiff's derivative shareholder suit.

**V.     Conclusion**

For the foregoing reasons, the court **GRANTS** the SLC's motion to terminate the derivative shareholder suit (Docket Nos. 96, 171) and **DISMISSES** the same.


**SO ORDERED.**

In San Juan, Puerto Rico this 14th day of July, 2011.


*s/ Gustavo A. Gelpí*

GUSTAVO A. GELPI

United States District Judge